# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

SHARON MAGEE, ET AL.,         )
         Plaintiffs,        )
                                )
        v.                     )        CAUSE NO.:  2:06-CV-00088-PRC
                                )
CITY OF GARY, INDIANA, ET AL.      )
         Defendants.      )

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 38], filed by the Defendants, City of Gary, Indiana, James Gonzales ("Officer Gonzales"), Greg Tatum ("Officer Tatum"), John Suttles ("Officer Suttles"), Kamal Minkah ("Officer Minkah"), Garrett F. Watson, Jr.("Police Chief Watson"), Gary Police Officers, John Doe 1 through John Doe 4, and the Gary Police Department (collectively, "Defendants"), on August 15, 2007; a Plaintiff's Motion in Opposition to Summary Judgment [DE 53], filed on September 19, 2007; and a Motion to Strike [DE 57], filed by the Defendants on October 3, 2007.  On  September 19, 2007, Sharon Magee ("Mrs. Magee"), as Personal Representative for the Estate of Kinnell Lamon Magee, Deceased ("Kinnell" or "Decedent"); Willie Magee ("Mr. Magee"); and Christina Shannon ("Ms. Shannon") (collectively, "Plaintiffs"), filed a Plaintiffs' Amended Memorandum of Law in Opposition to Motion for Summary Judgment, and on October 3, 2007, the Defendants filed a Reply Brief in Support of Defendants' Motion for Summary Judgment.  On October 9, 2007, the Plaintiffs filed a Plaintiffs' Objection to Defendant's Motion to Strike, and on October 15, 2007, the Defendants filed a Reply to Plaintiffs' Objection to Defendant's Motion to Strike.  For the following reasons, the Court grants in part and denies in part all three Motions.

## PROCEDURAL HISTORY

On February 22, 2006, the Plaintiffs filed a Complaint in the Lake Superior Court, alleging four distinct claims.  On February 28, 2006, the Plaintiffs filed a First Amended Complaint in the Lake Superior Court, adding four additional claims.  Pursuant to 42 U.S.C. § 1983, the Plaintiffs allege that the Defendants used excessive force and/or had a practice or policy authorizing the use of excessive force, which violated Kinnell's Fourth and Fourteenth Amendment rights as provided by the United States Constitution and his Fourth Amendment rights as provided by the Indiana Constitution.  The Plaintiffs also allege claims under 42 U.S.C. § 1983 against all Defendants for failing to render appropriate care, and against the City of Gary and the Gary Police Department for failing to provide adequate training to the City's police officers.  The Plaintiffs' final 42 U.S.C. § 1983 claim is an excessive use of force claim against Officer Gonzales, alleging a violation of Mr. Magee's Fourth and Fourteenth Amendment rights as provided by the United States Constitution and his Fourth Amendment rights as provided by the Indiana Constitution.  The Plaintiffs, on behalf of Ms. Shannon, also assert a common law Indiana state tort claim against one unnamed police officer for intentional infliction of emotional distress.  Finally, the Plaintiffs seek punitive damages, pursuant to 42 U.S.C. § 1983.

On March 10, 2006, the Defendants filed an Answer to the Plaintiff's Complaint along with a jury demand.  Also on March 10, 2006, the Defendants filed a Notice of Removal, thereby removing this case from the Lake Superior Court to the United States District Court for the Northern District of Indiana based on federal question jurisdiction, 28 U.S.C. § 1441.

2

On March 27, 2006, Defendant Officers Gonzales, Tatum, Suttles, and Minkah, Police Chief Watson, and the Gary Police Department filed an Answer to First Amended Complaint.  On March 28, 2006, the Defendants collectively filed an Answer to Plaintiffs' First Amended Complaint.[1]

On August 15, 2007, the Defendants filed a Motion for Summary Judgment and supporting memorandum of law.  On September 19, 2007, the Plaintiffs filed a motion and memorandum in opposition to summary judgment.[2]  On October 3, 2007, the Defendants filed a Rule 56 Motion to Strike, seeking to strike portions of the Plaintiffs' memorandum of law in opposition to summary judgment.  The Motions are now fully briefed and before the Court.

The parties consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTION TO STRIKE

The Defendants move to strike (1) any reference in the Plaintiffs' brief in opposition to summary judgment or in any depositions filed with the brief to the proper method of administering CPR or to the physiological effects of CPR, as it was performed in this case; (2) any opinions as to the cause of Kinnell's death offered by a person who has not been qualified to render such an

---

[1]At the time of this filing, the Defendants, other than the City of Gary, were represented by different counsel than the City's counsel.  The Court gathers that confusion between defense counsel resulted in several of the Defendants filing multiple Answers to the First Amended Complaint.

[2]The Plaintiffs' Motion and supporting Memorandum filed on September 19, 2007, were the Plaintiffs' second response filings.  On September 12, 2007, the Plaintiffs filed a motion for leave to file an oversized brief of forty-six pages.  On September 13, 2007, the Court granted the motion.  The Plaintiffs' brief, as filed, was forty-three pages long single-spaced.  On September 18, 2007, the Court struck the brief for its failure to comply with Local Rule 5.1(a), which requires that court filings be double-spaced.  On September 18, 2007, the Plaintiffs filed a second motion for leave to file an oversized brief, this time requesting leave to file a fifty-five page brief.  On September 19, 2007, the Court granted leave and the Plaintiffs' second version of their response to summary judgment complied with the Court's order.

opinion; (3) any remarks made by Ms. Shannon on the videotape filed in the record, which depicts a portion of the incident; and (4) the portion of the Coroner's Verdict that states, "While trying to handcuff the decedent the officers put the decedent in some kind of choke hold, because he kept struggling and resisting arrest." Pl.'s Br. Ex. 7 at 13. The Court will separately address each statement that the Defendants desire to strike.

## A. Statements concerning CPR

The Defendants argue that the Plaintiffs have not laid proper foundation for the Court to consider deposition testimony of Officers Gonzales and Suttles regarding the adequacy of CPR rendered by Police Chief Watson, or about the possible physiological effects of Watson's CPR. The Defendants request that statements in the Plaintiffs' briefing relying on that testimony be stricken. The Plaintiffs submit three arguments in response: (1) testimony regarding Police Chief Watson's methodology of administering CPR is admissible under Federal Rule of Evidence 406 as habit evidence; (2) the Defendants will not be prejudiced by the references contained in the Plaintiffs' brief and supporting documents to the adequacy of Police Chief Watson's CPR or the proper method of administering CPR; and (3) the Defendants waived their objection because they failed to object to this issue at the Defendant police officers' depositions. The disputed testimony concerns CPR performed by Police Chief Watson, who attempted to revive Kinnell at the scene of the incident.

> Federal Rule of Evidence 406 provides,
>
> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed. R. Evid. 406. In *Simplex, Inc. v. Diversified Energy Systems, Inc.*, the United States Court of Appeals for the Seventh Circuit held that a party seeking to admit evidence of habit must establish

"the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." 847 F.2d 1290, 1293 (7th Cir. 1988). Here, the statements do not establish a regular practice of either Police Chief Watson or the other police officers providing testimony. Rather, the statements describe Police Chief Watson's actions at the incident, a single occasion, and attempt to frame them in the context of prior police knowledge or training. Thus, the police officers' testimony fails to discuss Police Chief Watson's CPR in a manner that would invoke the evidentiary rule reserved for habit evidence.

The statements are also not supported by proper foundation. Neither of the police officers who provided testimony concerning CPR testified that they have a medical background or sufficient experience with CPR to qualify them to render an opinion as to the standard for proper CPR or the effect of Police Chief Watson's CPR. The testifying officers were at most certified to administer CPR. Officer Gonzales testified that he previously underwent training to perform CPR but that at the time of his deposition, his training had expired. Officer Suttles testified that he had taken a class in CPR and theoretically knows how it works. That is the extent of the two officers' testimony regarding their knowledge of and experience with CPR. The officers' testimony is not sufficient foundation to qualify them to render opinions on the standard of proper CPR or on Police Chief Watson's CPR.

Finally, contrary to the Plaintiffs' argument, the Defendants' failure to object to the CPR related line of questioning at the officers' depositions is not fatal. Federal Rule of Civil Procedure 32(d)(3)(A) provides:

> Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the

5

taking of the deposition, unless the ground of the objection is one which might have
been obviated or removed if presented at that time.

Fed. R. Civ. P. 32(d)(3)(A). Pursuant to this rule, the Defendants are not prevented from raising the

issue of the witnesses' competency at this point in the proceeding.

Thus, based on two of the three grounds discussed above, the Court grants the Defendants'

Motion to Strike as to statements about the adequacy of the CPR rendered by Police Chief Watson

or about the possible physiological effects of Watson's CPR.

### B.  Opinions as to cause of death

With regard to opinions contained in the Plaintiffs' brief and the record regarding Kinnell's

cause of death, the Defendants argue that any such opinion rendered by a person who has not been

properly qualified should be stricken.  The Defendants contend that the only persons adequately

qualified to render opinions regarding Kinnell's cause of death are Young M. Kim, M.D., the

pathologist who performed the autopsy on Kinnell, and Dr. Salberg, a board certified physician

retained as a defense expert.  The Defendants assert that counsel for the Plaintiffs, in his briefing,

preferred a number of hypothetical causes of death, including hypothermia, improper CPR, and

medical aid response time.  The Defendants ask that these opinions be stricken.

The Plaintiffs contend that Kinnell's proximate cause of death is within the province of the

jury and that the Defendants will not be prejudiced by references to likely causes of death.  In

response, the Defendants' argue that the prejudicial effect of the Plaintiffs' posited causes of death

far outweighs their probative value and that such evidence should be excluded pursuant to Federal

Rule of Evidence 403.

The Court finds that the statements as to possible causes of Kinnell's death are theories

submitted by the Plaintiffs' counsel.  As such, the Court will not strike the statements from the

briefing.  However, the Court will decide the Motion for Summary Judgment in conformance with Federal Rule of Civil Procedure 56, which provides that the Court shall consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."  Fed. R. Civ. P. 56(c).  The Court's ruling on summary judgment will not be influenced by theories unsupported by appropriate evidence.  If the theories offered by the Plaintiffs' attorney are unsupported by evidence, the Court will reject those arguments or theories.

### C.  Oral statements of Christine Shannon recorded on videotape

The Plaintiffs and Defendants agree that the parties previously stipulated that any remarks made by Plaintiff Christine Shannon on the audio portion of the videotape entered in the record in this matter are inadmissible.  Thus, the Court, recognizing the parties' stipulation, will not consider Ms. Shannon's remarks in its evaluation of the pending Motion for Summary Judgment.

### D.  Selected portion of the Coroner's Verdict

The Defendants request that the Court strike the following portion of the Coroner's Verdict: "While trying to handcuff the decedent the officers put the decedent in some kind of choke hold, because he kept struggling and resisting arrest."  Pls.' Br. Ex. 7 at 13.  The Defendants contend that the statement should be stricken as hearsay if offered for its truth because neither the Coroner nor his investigator witnessed what happened during the incident and therefore the statement is not based on first-hand knowledge.  The Plaintiffs argue that the statement is not prejudicial to the Defendants and should be admitted as an exception to the hearsay rule pursuant to Federal Rule of Evidence 803.

Federal Rule of Evidence 803, subsection six, provides an exception to the hearsay rule for records of regularly conducted activity.  In order to qualify as a record of regularly conducted

activity, a statement must be "made at or near the time by, or from information transmitted by, a person with knowledge . . ." Fed. R. Evid. 803(6). The Defendants argue that the statement at issue was not made by a person with knowledge as contemplated by the rule. The Defendants contend that the Coroner did not have knowledge of what occurred at the scene of the incident and thus his memorandum describing the happenings do not qualify as an exception to hearsay under the business record exception. The Court agrees and grants the Defendants' Motion to Strike the quoted statement from the Coroner's Verdict for summary judgment purposes if the statement is offered for its truth. The Court finds that the statement is hearsay and that the exception provided in Federal Rule of Evidence 803(6) does not apply because the Court does not know, from the record, whether the source of the knowledge offered within the relevant quotation had knowledge (first-hand knowledge). Thus, the Court cannot know whether the hearsay is trustworthy or untrustworthy.

## MOTION FOR SUMMARY JUDGMENT

The Defendants move for summary judgment, alleging that no genuine issue of material fact exists as to any of the Plaintiffs' claims in this matter and that summary judgment should be awarded in their favor as a matter of law.

## FACTUAL HISTORY

Following are the facts viewed in the light most favorable to the nonmoving parties, the Plaintiffs. After a thorough review of the Plaintiffs' factual description of this case, the Court finds it necessary to note that the Plaintiffs' brief in opposition to summary judgment contains a number of factual misrepresentations, misquotes, and exaggerations. In this section, the Court engages in

analysis to establish a clear picture of the facts of this case, as submitted in the record to date, for all involved.

This lawsuit arises from the events that occurred on the morning of February 26, 2004, on South Hamilton Street in Gary, Indiana.  At that time, Kinnell Magee was a twenty-four year old 460-pound man who lived with his mother and father, and his brother, Willie Magee, Jr. ("Willie Jr."), at 350 South Hamilton Street in Gary, Indiana.  That morning, Kinnell experienced what the Plaintiffs describe as a severe psychotic episode marked by disorientation, confusion, and inability to speak.

Less than one week earlier, Kinnell presented to Methodist Hospital Northlake Campus ("Methodist Hospital") complaining of headaches.  Kinnell underwent diagnostic testing, including a CT scan.  The testing revealed no abnormalities.  Physicians diagnosed Kinnell with migraine headaches and instructed him to take Tylenol for his pain before releasing him from the hospital with prescriptions for two medications, one commonly used to treat headaches, the other used as a muscle relaxer.  According to Mrs. Magee, physicians directed Kinnell to follow up with a doctor but he never did.  Mr. Magee recalls that Kinnell had breathing and head problems after his release from the hospital.

Recalling the morning of February 26, 2004, Mr. Magee describes Kinnell as going berserk.  Mr. Magee awoke that morning to a disturbance below his bedroom in the kitchen.  Mr. Magee went downstairs to see what was wrong and found Kinnell standing naked in the kitchen.  Kinnell had thrown a bowl of cereal across the room and was gasping for air.  Kinnell had what Mr. Magee describes as a crazy look in his eyes and was unable to respond when Mr. Magee asked him what was wrong.  Kinnell was also foaming at the mouth and seemed like he did not know what was

going on.  Kinnell then left the kitchen and went outside the house through a side door.  Mr. Magee chased after Kinnell and saw that Kinnell's eyes were rolling back in his head as he continued to foam at the mouth.  Mr. Magee repeatedly attempted to get Kinnell under control, even trying to tackle him, but was unsuccessful.  Mr. Magee asked neighbors to call for help.  At approximately 10:48 a.m., emergency 911 received a call requesting assistance at South Hamilton Street.

According to Willie Jr., who returned home from a trip to the store with his mother after his father and brother had already gone outside, when he walked inside the home, it looked as if Kinnell and Mr. Magee had been in a fight.  Speakers were on the ground, blinds were torn up, a chair was broken, and the side door was open.

In response to the request for 911 emergency assistance, the Gary Police Department dispatched Officer Suttles.   At the time, Officer Suttles was using his police vehicle to give a ride to Officer Minkah, an off-duty Gary Auxiliary-Police Officer whose car was in the shop and needed a ride from the repair shop.  The Gary Police Department also dispatched Officer Tatum to the scene, reporting a naked man running down the street.  Officer Gonzales overheard the dispatch on the police scanner and drove to South Hamilton Street to assist.

According to the Officers' statements, when they arrived at the scene, Kinnell and Mr. Magee were on the porch.  Kinnell was standing on the porch naked, sweating, and foaming at the mouth.  Kinnell was allegedly muttering, unable to verbalize his thoughts, and was oblivious to his surroundings.  Upon arriving, Officers Suttles and Minkah approached the bottom steps of the porch.  Mr. Magee was allegedly yelling at his son and attempting to place a cover over him.  Kinnell resisted and pushed his father away.  Mr. Magee contends that he requested that the police officers call an ambulance because his son was berserk and had taken off his clothes before going outside.

10

At one point, Kinnell allegedly pushed Mr. Magee into Officer Suttles while Kinnell walked toward the sidewalk.  It is a settled fact that Kinnell did not have a weapon.

Soon after, Officer Suttles approached Kinnell and attempted to get him under control. According to the Plaintiffs, Officer Suttles bent Kinnell's left arm behind his back and leaned him into police squad car #127, which was parked in the street.  Officer Minkah also engaged in the situation and pulled out his police issued expandable baton in order to prepare himself.  Officer Minkah grabbed Kinnell's left leg, causing Kinnell to lose his balance and go down to the pavement. According to the Plaintiffs, Officer Minkah pulled up on Kinnell's left arm while Officer Tatum firmly pulled up on his right arm, restricting his airway.  Officer Minkah then allegedly applied a handcuff to Kinnell's right arm and pressed weight on Kinnell's chest and abdomen.

The commotion caught the attention of Ms. Shannon, one of the Magees' neighbors.  Ms. Shannon proceeded to videotape a portion of the incident.  The video depicts several police officers engaged with and standing around Kinnell.  Kinnell is laying nude, face down on the street when the video begins.  One officer, who the Plaintiffs contend is Officer Minkah, is straddling Kinnell's back side.  Officer Minkah is struggling with Kinnell and appears to be trying to cuff Kinnell's hands behind his back.  Two other officers are also involved, trying to control and subdue Kinnell. The video shows Officer Minkah make a punching motion toward Kinnell's side or abdomen area. Meanwhile, Kinnell is kicking his feet and struggling.  The video is taken directly behind Officer Minkah and the Officer's back blocks his arms from view of the camera.  However, the Plaintiffs contend that Officer Minkah applied a choke hold to Kinnell with an expandable baton.  While Officer Minkah is straddling Kinnell, Mr. Magee approaches with a blanket and hands the blanket

to Officer Minkah who places the blanket over Kinnell's nude body.  Another officer then physically escorts Mr. Magee away from Kinnell, applying one hand to Mr. Magee's chest.

Ms. Shannon filmed the incident through several windows facing the street where the police officers and Kinnell were located.  During her filming of the incident, on several occasions, Ms. Shannon moved from window to window, changing her view of the scene.  It was right before one of these changes, while Officer Minkah was straddling Kinnell, that Kinnell's legs stop moving. The video shows Officer Minkah jump off Kinnell and begin to roll him onto his back.  Ms. Shannon then moves to a different window.  When the video returns to focus the officers have rolled Kinnell onto his back and he is now lying nude in the street, his back to the ground.  Kinnell has completely stopped moving at this point.  Mr. Magee again approaches, this time taking his jacket off and handing it to a police officer.  The officer drapes the jacket on Kinnell's body.  The police officers stand around the body for several seconds until Police Chief Watson arrives.  Watson and another officer then spend several minutes pumping on Kinnell's chest.  Their efforts fail to revive Kinnell. When the videotape ends, Kinnell remains motionless on the pavement.

At deposition, Mr. Magee testified that five or six police officers were on Kinnell, "crushing him to death."  Defs.' Br. Ex. 2 at 16.  Mr. Magee also testified that the police hit him in the top of the head with a baton, trying to keep him away from Kinnell.  Willie Jr. also gave a deposition. Willie Jr. was present during the incident and can be seen in Ms. Shannon's videotape.  Willie Jr. testified that he observed the police officers jumping on his brother as if they were trying to beat him.  He explained that several of the officers choked and hit his brother with billy clubs.  He testified that the officers hit his brother more than ten times in the back, stomach, legs, and around the neck area.  He explained that the officers hit Kinnell while he was standing, a portion of the

12

incident that was not captured on video.  Willie Jr. testified that none of the officers who beat his brother were in the room during Willie Jr.'s deposition and that he would never forget those officers' faces.  The transcript of Willie Jr.'s deposition indicates that Officer Tatum was present during the deposition.  Mrs. Magee testified at deposition that she observed officers jumping on Kinnell in the videotape.

The Defendant police officers' deposition testimony and written statements, for the most part, provide the same version of the events that transpired on South Hamilton Street.  Officer Suttles testified at deposition that when dealing with an individual who was mentally ill or who was in a crisis, he would make sure that the Gary Fire Department ("GFD") was en route.[3]  Officer Suttles testified that he called GFD emergency services while he was en route to the incident, at approximately 10:30 a.m.  Officer Minkah was in the police squad vehicle with Officer Suttles when the original dispatch came through to Suttles reporting an incident at 350 South Hamilton Street.  Officer Minkah testified at his deposition that he did not know who called the GFD ambulance.  Officer Minkah testified that the first he knew of an ambulance being called was after the officers turned Kinnell over with his back to the ground.  Officer Minkah testified that he did not think that the Gary Police Department's standard operating procedures contained any information about how to deal with the mentally ill.  Officer Minkah testified that he did not know who called for an ambulance.

Officer Minkah further testified that during the incident, he grabbed Kinnell's leg to gain control, which was a wrestling maneuver used to take a person down.  He stated that the Gary Police

---

[3]In their brief in opposition to summary judgment, the Plaintiffs represent that Officer Suttles testified at his deposition that the GPD had a standard operating procedure for dealing with mental subjects to make sure that GFD was en route with a medical unit.  To the contrary, Officer Suttles testified that, "I don't know if there was a standard procedure, but I would always make sure GFD was en route."  Pls.' Br. Ex. 29 at 9.

Department Standard Operating Procedures ("SOP") did not provide for such a wrestling maneuver. In answer to the question "weren't you worried if you pulled on his leg he could just fall and bash his head into the car?" Officer Minkah responded, "I was more so worried about if he fell, he would fall on me."[4]  Pls.' Br. Ex. 30 at 41.  Once Kinnell was to his knees, Officer Minkah sat on his back side to hold him down and began to handcuff him but he had some difficulty applying the handcuffs due to the size of Kinnell's wrists.  Officer Minkah allegedly placed Kinnell's right arm in an arm lock by using his expandable baton.  This allegedly caused Kinnell to go face down into the pavement.

Officer Minkah stated in his official report that he observed Kinnell push Mr. Magee and felt that there was a potential for danger.  According to his testimony, at that point Officer Minkah took out his baton to prepare himself.  Officer Minkah attempted to assist Officer Suttles in restraining Kinnell and the two officers were able to pull Kinnell to the ground.  He further stated that he straddled Kinnell and sat on his buttocks, pressing his weight on Kinnell's torso.  Officer Minkah had a difficult time handcuffing Kinnell but was able to secure his wrists with three sets of handcuffs.  Officer Minkah heard Kinnell say that he could not breathe, but notes in his report that Kinnell was still talking, moving, and resisting.  Officer Minkah reports that he heard Kinnell repeat that he could not breathe.  Officer Minkah states that at that point, he immediately rolled Kinnell over and saw Kinnell staring at the sky.

Officer Gonzalez testified at his deposition that he called for medical assistance as soon as he arrived on the scene.  An incident report prepared by Officer Gonzales on March 1, 2004, states

---

[4]In their brief, the Plaintiffs misquote Officer Minkah as testifying that "I did not care if Kinnell fell and bashed his head as a result of the use of the wrestling move, I was more worried that he might fall on me and I might injure myself." Pls.' Br. at 5.

that he arrived on the scene and witnessed Kinnell and his father pushed each other while Mr. Magee attempted to cover Kinnell with a blanket.  Officer Gonzales reports that he repeatedly called out to Kinnell to settle down.  Officer Gonzales states that he then contacted headquarters to send GFD as soon as possible.  The police officers attempted to subdue Kinnell and took him to the ground. After the officers subdued Kinnell, they linked handcuffs together to cuff his wrists.  Officer Gonzales states that Kinnell was still being resistant and would not allow officers to restrain him. Officer Gonzales states that Mr. Magee repeatedly tried to approach Kinnell and Officer Gonzales had to restrain him.  While the other officers were still wrestling with Kinnell, he said he could not breathe.  The officers then rolled him onto his back and noticed that Kinnell had stopped breathing. Officer Gonzales then contacted headquarters again and advised them to send GFD as soon as possible.  He asked for an estimated time of arrival and was told approximately five minutes.[5]

At his deposition, Officer Gonzales testified, "In order to perform CPR, it would have required that I place my mouth on his and I wouldn't have done that."  Pls.' Br. Ex. 28 at 49.  Officer Gonzales testified that Police Chief Watson, who arrived on the scene after Officer Gonzales, was the only officer to perform chest compressions, that no officer cleared Kinnell's airway, and that no officer performed mouth-to-mouth resuscitation.

According to an undated written report composed by Officer Tatum, when Officer Tatum arrived on the scene, Kinnell was nude in the street with another man, who turned out to be Mr. Magee.  Three officers were present, Officers Suttles, Gonzales, and Minkah. Kinnell appeared to be disoriented and uncooperative.  He had saliva coming out of the corner of his mouth.  Kinnell and

---

[5]In their brief, the Plaintiffs represent that Officer Gonzales reflected in his incident report that "he was aware of the use of excessive and deadly force and he took no action to intervene."  Pls.' Br. at 8.  The Court's review of the incident report reveals no such representations.

Mr. Magee yelled back and forth at each other and Kinnell did not respond to the officers' requests that he calm down.  Kinnell walked away from the officers toward the middle of the street.  Mr. Magee attempted to cover Kinnell with a blanket and Kinnell pushed him away several times.  At this point, Officer Suttles positioned himself between Kinnell and Mr. Magee and Kinnell pushed him.  Officer Suttles grabbed Kinnell's left wrist and put Kinnell's left arm to his backside and moved Kinnell to the front of squad car #127 in front of 361 South Hamilton Street.  Officer Minkah then handed Officer Tatum his baton and proceeded to assist Officer Suttles.  Officers Suttles and Minkah gained control of Kinnell.  Kinnell struggled with the officers and Officer Tatum told him to settle down several times.  As the officers continued to restrain him, Kinnell stated that he could not breathe.  The officers rolled him over and Officer Tatum stated, "he's not breathing."  Pl.'s Br. Ex. 6 at 2. Officer Tatum concludes his report by recounting that Police Chief Watson then arrived on the scene and began to perform CPR, which Officer Tatum assisted.  During CPR, vomit came out of Kinnell's mouth.

Police Chief Watson, in his answers to the Plaintiffs' interrogatories stated, "all officers receive training as mandated by the State of Indiana.  All officers are trained in the use of force at the police academy and all officers receive continuing education as mandated by the State which probably includes restraint techniques and the use of force." Pls.' Br. Ex. 23 at 6.  Officer Gonzalez stated in deposition that the Gary Police Department did not provide him with any additional training in hand-to-hand encounters with people.  With regard to responding to incidents involving the mentally ill, Officer Gonzalez testified that he attended a forty-hour week long training course hosted by the National Alliance of the Mentally Ill that discussed subjects such as how to handle the mentally ill with communication and restraint.  Officer Gonzales testified that the City of Gary has

protocols or polices for dealing with the mentally ill, which he could not recall verbatim but which he summarized as stating that some individuals can be placed in a twenty-four hour emergency detention at Methodist Hospital.

The Plaintiffs contend that following the incident, a Gary Police Officer knocked on Ms. Shannon's door and threatened to arrest her if she refused to turn her videotape over to the police. At 11:02 a.m., Gary Fire Department Ambulances #401 and #500 arrived on scene and unit #401 transported Kinnell's body to Methodist Hospital.  At 11:33 a.m., Kinnell's pupils were fixed and dilated.  Kinnell was pronounced dead at 11:52 a.m.

Mrs. Magee testified at deposition that she went to the hospital after the incident.  She saw Kinnell in the emergency room.  Mrs. Magee reported that Kinnell looked dirty everywhere but that she did not observe any blood on his head or feet, which were the only exposed body parts.

On February 27, 2004, Deputy Lake County Coroner, Young M. Kim, M.D., performed an autopsy on Kinnell.  The Coroner's report, dated July 21, 2004, under the section titled "Manner of Death," reflects "natural," and under "Cause of Death," states, "cardiac arrhythmia with moderate cardiomegaly and acute tubular necrosis of kidney marked obesity."  Pls.' Br. Ex. 7 at 1.  The report states that the "only visible trauma to the body was [sic] abrasions on the outer/upper right forearm, and a slight one on the fourth toe of the left foot."  *Id.* at 11.  Dr. Kim made the following anatomical findings: moderate cardiomegaly with pericardial effusion (abnormal fluid around an enlarged heart); congestion of lungs; marked hepatosplenomegaly (enlarged liver and spleen) with marked fatty metamorphosis; marked obesity; acute extensive tubular necrosis of the kidney.  Blood and urine collected was found to be negative for drugs or alcohol.

The Defendants retained a medical expert, Larry M. Salberg, M.D., the Medical Director of the Northern Indiana Neurological Institute.  Dr. Salberg submitted the following opinion after reviewing the videotape, the coroner's findings, and other relevant information:

> Mr. Kinnell Magee died of natural causes.  The police officers did absolutely nothing which would cause or contribute to the death of Mr. Magee. . . .  This is based on the Realtime DVD, the autopsy findings lacking any significant signs of trauma, and the fact that Mr. Magee was having significant medical problems prior to the police being called in to control the situation at hand.

Defs.' Br. Ex. 14 at 1.

## STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

19

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The court applies "the same standard in reviewing cross-motions for summary judgment." *Bleavins v. Bartels*, 422 F.3d 445, 449 (7th Cir. 2005). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## ANALYSIS

The Plaintiffs assert several causes of action under 42 U.S.C. § 1983, alleging that the Defendants, through the use of excessive and deadly force, directly or indirectly violated Kinnell's Fourth and Fourteenth Amendment rights as guaranteed by the United States Constitution and Fourth Amendment rights as guaranteed by the Indiana Constitution. Mr. Magee asserts a similar cause of action; however, he alleges that rather than deadly force inflicted by all of the Defendants, he was the victim of Officer Gonzales's use of excessive force resulting in severe and permanent bodily injuries. Ms. Shannon alleges that one of the Defendant police officers engaged in the tortious act of intentional infliction of emotional distress when he attempted to retrieve the videotape she recorded of the incident. The Plaintiffs also seek punitive damages under 42 U.S.C. § 1983.

### A.  42 U.S.C. § 1983

The Plaintiffs assert a number of claims under 42 U.S.C. § 1983. The Court begins its analysis with the text of the statute, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United

20

States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

### 1.  Claims against individual police officer defendants

The Plaintiffs assert claims against the police officer Defendants alleging that the individual Defendants used excessive force, that one Defendant failed to intervene to prevent the excessive use of force, and that all of the Defendants failed to render appropriate care.  In response, the individual Defendants assert that they are protected from liability by qualified immunity.  The Court frames its evaluation of the Plaintiffs' claims in the context of a qualified immunity analysis.

When a defendant asserts qualified immunity, a ruling on that issue "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Qualified immunity shields government officials, such as police officers, performing discretionary functions from liability in a lawsuit seeking civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Leaf v. Shelnutt*, 400 F.3d 1070, 1079-80 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  Whether qualified immunity shields a defendant from liability requires the court to apply a two-part test.  The threshold question is whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right.  *See Saucier*, 533 U.S. at 200-01; *McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002).  If the facts reveal that no constitutional violation occurred, the inquiry ends and the defendant is absolved of liability.  *See Saucer*, 533 U.S. at 201; *Jordan v. Indianapolis*, No. IP-01-1391-C-H/K, 2002 WL 32067277, at * 6 (S.D. Ind. Dec. 19,

2002).  If the facts adequately allege a constitutional violation, the inquiry continues to a second question of whether the right violated was "clearly established" at the relevant time.  *Id*.  "The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  If both questions are answered in the affirmative, the defendant will not receive protection from qualified immunity.  *See Jordan*, 2002 WL 32067277 at *6.

The reasonableness standard used to evaluate a defense of qualified immunity is similar to but slightly different than the standard used to evaluate whether an officer used excessive force.  *See Saucier*, 533 U.S. at 204.  Both standards are objective reasonableness standards.  Discussing the excessive use of force standard, Supreme Court precedent dictates that "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This standard requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. at 396. (citations omitted).  According to *Graham*, the analysis is:

> not capable of precise definition or mechanical application . . . however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*. (citations omitted).

In addition, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  When evaluating the amount of force necessary in a certain situation, "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396-97.  "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978); *Terry*, 392 U.S. at 21).  The reasonableness standard applied to a qualified immunity analysis adds the additional acknowledgment "that reasonable mistakes can be made as to the legal constraints on particular police conduct."  *Saucier*, 533 U.S. at 205.  "If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense. " *Id*.

### a.  Alleged constitutional violations

Under the first prong of the qualified immunity analysis, the Plaintiffs assert that a number of constitutional violations occurred during their interaction with the Defendant police officers.  The Plaintiffs assert three distinct claims that the Defendants used excessive force in violation of Kinnell and Mr. Magee's Fourth and Fourteenth Amendment rights under the United States Constitution and Fourth Amendment rights under the Indiana Constitution.  Only the claims brought under the federal Constitution are discussed in this section.

### i. Excessive force by Officers Suttles, Tatum, and Minkah against Kinnell

The Plaintiffs allege that Officers Suttles, Tatum, and Minkah used excessive and deadly force against the Decedent, Kinnell Magee.  The Plaintiffs make repeated comparisons between the § 1983 claims asserted in the instant case and those asserted in the Seventh Circuit case *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005).  In *Abdullahi*, a nurse driving to work spotted a man staggering across three lanes of traffic.  She observed that he was breathing heavily and in apparent physical distress; he stumbled and fell when he reached the curb of the sidewalk.  The nurse stopped her car and got out to attempt to help the man who then ran back into traffic, threw debris at her, and grabbed her hair and clawed at her uniform.

Meanwhile, a city police officer received a dispatch reporting the incident.  When the officer reached the scene, she observed the man lying on his back near the curb.  The officer called for fire rescue in case the man needed medical attention.  As the officer approached, the man sat up and began swinging his belt over his head.  At this point, two other police officers responded to the disturbance. The man grew hostile and three officers grabbed the man's arms and took him to the ground, onto his stomach.

On the ground, the man kicked and screamed and moved his arms so they could not be handcuffed.  A fourth officer arrived on the scene and grabbed one of the man's legs in order to keep him under control.  Another officer placed his knee and shin on the back of the man's shoulder area and applied his weight to keep the man from flailing.  The man stopped struggling about fifteen to twenty seconds after the officer applied his weight to the man's shoulder area.  The officer then cuffed the man and lifted his weight off the man's shoulder.  In all, the officer estimated that he

applied weight to the man's shoulder for between thirty and forty-five seconds. Two eye witnesses testified that the officers did not use excessive force on the man.

The officers reported that the man was still breathing after being handcuffed. At some point, another officer arrived at the scene and did not observe any movement from the man. The police officers soon realized that the man was not breathing. Fire rescue workers had just arrived on scene and the police officers removed the constraints so paramedics could initiate resuscitation efforts, which were unsuccessful. The man died approximately two and a half minutes after the officers took him to the ground.

Thus far, *Abdullahi* is nearly identical to the instant case. However, the facts differ in one important respect. The plaintiff in *Abdullahi* was able to provide testimony of four doctors that the man died of chest and neck trauma, including a collapsed lung, and injuries consistent with strangulation. The man's mother brought claims against the police officers under 42 U.S.C. § 1983, alleging excessive force in violation of his Fourth Amendment rights. The defendants subsequently filed for summary judgment. Evaluating the motion, the court made two primary findings of facts: (1) that the police officer knelt on the decedent's back while he laid prone on the ground; and (2) the decedent died roughly two minutes later of injuries consistent with pressure and crushing trauma. *See id.* at 769. The plaintiff also offered expert testimony that the kneeling officer's tactic violated standard police practices, which the court found relevant to the Fourth Amendment reasonableness inquiry. *See id.* at 772. The court ultimately denied summary judgment, finding that the medical evidence and evidence of diversion from police practice supported an inference of unreasonable conduct. *See id.* at 773. The court cited circuit court precedent that "'summary judgment or

judgment as a matter of law in excessive force cases should be granted sparingly.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Here, as noted, the facts diverge in one crucial area. While the Plaintiffs provided evidence that Officer Minkah applied weight to Kinnell's back, they were unable to provide medical evidence that Kinnell died from injuries consistent with physical abuse. The coroner who examined Kinnell's body found that Kinnell died in a "natural" manner caused by "cardiac arrhythmia with moderate cardiomegaly and acute tubular necrosis of kidney [and] marked obesity." Pls.' Br. Ex. 7 at 1. None of the causes of death in the Coroner's Report are consistent with injuries sustained from the alleged beating inflicted by the Defendants. Nor do the Plaintiffs provide any supporting medical opinions for their theory that Kinnell died due to the officers' use of excessive force. Cardiac arrhythmia indicates an irregular rate of heart activity but the Plaintiffs' failed to provide any specific facts or evidence that Kinnell's heart was affected by the Defendants' conduct rather than by his existing health conditions. Here, the causes of death are what the Coroner deemed to be natural for a man in Kinnell's physical condition. Thus, the causation that was clearly present in *Abdullahi*, testified to by four doctors, is absent here.

Another similar factual setting is presented in *Phillips v. City of Milwaukee*, in which police officers responded to a call that a man refused to leave his hotel room. *See* 123 F.3d 586 (7th Cir. 1997). Upon responding to the scene, the officers were informed that the man had been behaving strangely for the past two days and found him to be disheveled and unable to respond to simple questions. As the police officers approached, the man, a large individual, clenched a ball point pen in each of his hands. Witnesses testified that the officers were not hostile or abusive. The man, on the other hand, was extremely violent. The officers seized his wrists, took him to the ground, and

restrained him using two sets of handcuffs.  One of the officers knelt on the man's back for between thirty seconds and one minute.  The man calmed down a few minutes later.  Several minutes after the confrontation began, it was discovered that the man had stopped breathing.  After a revival at the scene, the man died the next day.  The court upheld an award of summary judgment in favor of the defendants, finding that the officers' response was objectively reasonable under the circumstances.  *See id*. at 593.  The court reasoned that "restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."  *Id*. (citing *Mayard v. Hopwood*, 105 F.3d 1226, 1127-28 (8th Cir. 1997)).

Arguing that Officers Suttles, Tatum, and Minkah acted reasonably, the Defendants contend that the use of force against Kinnell was necessary and that the Defendant police officers used a reasonable amount of force under the circumstances.  The Defendants cite to the Indiana Immediate Detention Statute, Indiana Code § 12-26-4-1, which provides that "[a] law enforcement officer, having reasonable grounds to believe that an individual has a mental illness, is dangerous, and is in immediate need of hospitalization and treatment, may . . . [a]pprehend and transport the individual to the nearest appropriate facility."  Ind. Code § 12-26-4-1.  While the statute provides a basis for justifying taking Kinnell into custody, it does not absolve the police officers' potential liability arising from the Plaintiffs' claims of excessive use of force.

It is common in excessive use of force cases, as happened here, that the parties come away with differing factual recollections of the incident.  *See Garmin v. Wheeler*, 304 F.3d 628, 634 (7th Cir. 2002) (when lower court denied summary judgment, appellate court upheld the ruling and found that essential dispute of case concerned which party's version of facts was true and defendant police officer claimed that the decedent pulled a gun and a struggle ensued during which the defendant shot

27

and killed the decedent and the plaintiff claimed that the decedent never pulled a gun and that no

struggle took place); *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 863 (S.D. Ind. 2006)

(finding that a genuine issue of material fact existed when the plaintiff alleged that defendant police

officers violently stomped and kicked him for at least thirty seconds and allowed a police dog to bite

his leg after he had surrendered and the defendants disputed that version of the incident); *Jordan*,

2002 WL 32067277 at *6 (court found genuine issue of material fact existed for jury consideration

when plaintiff, who was suicidal and refused to come downstairs in his home, alleged that defendant

police officers charged him, sprayed him with mace, hit him with a large metal flashlight and tackled

him to the ground, and the officers maintained that the plaintiff was agitated, aggressive, and

physically violent toward them, necessitating the use of force).

Here, the Plaintiffs contend in their briefing that despite his weight, Kinnell did not have any

other serious medical problems that would have led to his death.  However, the Coroner's Report

described above, and the Plaintiffs' own brief suggest otherwise.  In their brief, the Plaintiffs state

that "Kinnell was likely suffering from some type of physiological condition that inhibited his

strength and left him in a weakened condition."  Pls.' Br. at 45.  In addition, the coroner's report

described Kinnell as being obese and having an enlarged heart and other weight-related health

problems.  Based on this information, the Defendants' medical expert, Dr. Salberg, opined that "Mr.

Kinnell Magee died of natural causes."  Defs.' Br. Ex. 14 at 1.

Despite Kinnell's documented health conditions, the Plaintiffs offer a clear allegation that

the Defendants beat Kinnell and used excessive force in restraining him and bringing him to the

ground.  The Plaintiffs state this claim in their pleadings and briefing in this matter and have

supported it through their deposition testimony.  Mr. Magee testified that he witnessed police

officers tackle Kinnell and restrain his movement by putting their knees on his throat.  Willie Jr. testified that he witnessed the officers repeatedly strike Kinnell with batons.  Mr. Magee testified that he saw certain events that Willie Jr. did not recall at his deposition, and vice versa.  The Defendants disagree with the version of events described by each of the Plaintiffs and argue that the varying accounts in the Plaintiffs' deposition testimony discredit the deponent witnesses.  Viewed in a light most favorable to the Plaintiffs, the chaotic environment surrounding the incident, where police officers were physically involved with Kinnell, and the witnesses were also involved with the police, is a reasonable explanation for Mr. Magee and Willie Jr. having witnessed different portions of the incident.  At this time, the Court does not find that Mr. Magee and Willie Jr.'s testimony is entirely unreliable.

In addition to the pleadings and deposition testimony, the Plaintiffs submit indisputable evidence in the form of a videotape depicting a portion of the incident.  The videotape shows Officer Minkah straddling Kinnell's lower back region while Kinnell struggles face down on the pavement kicking his feet.  Officer Minkah appears to be applying his body weight to Kinnell's midsection while Kinnell lies face down, a tactic that other cases reviewed above have shown can cause difficulty breathing.  While according to *Phillips*, detaining a person in a prone position may not be excessive force in and of itself, here, the officers are alleged to have gone beyond mere detainment.  Officer Minkah's back blocks the camera's view of his arms so the viewer in unable to tell if Officer Minkah is choking Kinnell with a baton as the Plaintiffs' allege.  The opening portions of the video show Officer Minkah apply a punch to Kinnell's side or abdomen area, although the viewer cannot discern how hard the blow makes contact with Kinnell.  The videotape shows physical contact mainly between Kinnell and Officer Minkah.  However, the allegations, deposition testimony, and

incident reports all suggest that Officers Suttles and Tatum were involved in a physical struggle with Kinnell as well.  The evidence submitted by the Plaintiffs, in its entirety, does not establish causation in the manner seen in *Abdullahi*, but it does present a triable question of material fact of whether the Defendant officers acted reasonably.  It is for a jury to determine issues of material fact in this case, not the Court.  The Court therefore denies the Defendants' Motion for Summary Judgment as to the Plaintiffs' § 1983 claim that Officers Suttles, Tatum, and Minkah used excessive force against Kinnell.

### ii. Excessive force by Police Chief Watson against Kinnell

The Plaintiffs also allege that Police Chief Watson engaged in excessive use of force against Kinnell.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he was (1) deprived of a federal right, privilege, or immunity (2) by a person acting under color of state law.  *See Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005) (citing *Gomez v. Toledo*, 446 U.S. 635, 638 (1980)).  The Plaintiffs allege that Police Chief Watson negligently or recklessly authorized or directed the other police officers at the scene of the incident to engage in excessive or deadly force.  The Plaintiffs further allege that Watson was present at the scene of the incident and exercised final decision-making authority for the law enforcement methods used and the application of excessive and deadly force.  The Plaintiffs name Police Chief Watson as a defendant "individually, and in his official capacity as Police Chief of the Gary Police Department."  Am. Compl. at 1.

The distinction between a 42 U.S.C. § 1983 claim containing allegations against an individual in his personal or in his official capacity is not insignificant.  *See Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991).  Personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law. . . .  Official-capacity suits, in

30

contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. City Dept. of Social Serv. of City of New York*, 436 U.S. 658, 690 n. 55 (1978)).  In an official capacity suit, the plaintiff alleges that the defendant was a party to the execution or implementation of the unlawful policy or conduct by a municipality.  *See Hill*, 924 F.2d at 1372.  In an official capacity suit, the real party in interest is the municipality.  *See id*.  The Plaintiffs' allegation that the City of Gary or the Gary Police Department enacted a policy or widespread practice depriving constitutional rights or that a final policymaker acted to deprive the Plaintiffs' constitutional rights is discussed *infra*.  The outcome of any potential liability for Police Chief Watson's action in his official capacity will also be resolved in that discussion.[6]

With regard to the Plaintiffs' claim against Police Chief Watson in his personal capacity, the Plaintiffs can successfully allege that a private individual acted under the color of state law for § 1983 purposes in one of the following two ways: (1) when the state has cloaked the defendant in some degree of authority, normally through employment or other agency relationship, or (2) when the defendants complied or acted in concert with state officials to deprive a person of his civil rights. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961), overruled on other grounds, *Monell*, 436 U.S. at 690) ("[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State"); *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003).  "Action is taken under color of state law when

---

[6]This statement holds true for the individual police officer Defendants as well.  The Court declined to engage in this analysis in the previous section discussing the officers' § 1983 liability due to the manner in which the issue is framed in the Plaintiffs' pleadings, which as to allegations of unlawful acts committed in an official capacity, primarily target Police Chief Watson.

it is made possible only because the wrongdoer is clothed with the authority of state law." *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989).

Here, the Plaintiffs allege that Watson was the "Chief of the Gary Police Department" and that he "was an authorized agent, servant and/or employee of the Defendants Gary Police Department and the City of Gary, Indiana, a Municipal Corporation, acting within his authority and under color of law." Am. Compl. at 6-7, ¶ 16. Thus, the Plaintiffs' pleadings successfully allege that Police Chief Watson is an actor under color of state law and was a state actor.

Addressing the Plaintiffs' allegation that Police Chief Watson was on the scene and violated Kinnell's constitutional rights by making the final decision to use excessive and deadly force, the Court notes that the video of the incident shows Police Chief Watson's arrival at the scene. Police Chief Watson clearly arrives after Kinnell stopped moving. Therefore, the Court finds that it was factually impossible for Police Chief Watson to direct the officers to use excessive or deadly force in person. In their briefing, the Plaintiffs suggest that Police Chief Watson may have instructed officers present on the scene over police radio to use excessive or deadly force. This allegation is not supported by any facts in the record. The police officers' depositions do not discuss any order given by Police Chief Watson over the radio. Nor do the Plaintiffs' state that they overheard such an order. Thus, this claim is conjecture, which the Plaintiffs are unable to substantiate. Because the allegation alone is insufficient to defeat summary judgment, the Court grants the Defendants' Motion for Summary Judgment as to the Plaintiffs' § 1983 claim that Police Chief Watson, in his personal capacity, violated Kinnell's rights against the excessive use of force.

### iii.  Excessive force by Officer Gonzales against Mr. Magee

The Plaintiffs' final excessive force allegation contends that Officer Gonzales used excessive force against Kinnell's father Willie Magee.  Mr. Magee asserts that during the incident, Officer Gonzales pushed, shoved, and struck him in the face and body, and pushed him into a police car. Disputing the validity of any claim that Mr. Magee suffered injuries during the incident, the Defendants point to the videotape and medical records pertaining to treatment received by Mr. Magee at Methodist Hospital.

Mr. Magee's allegations of excessive use of force invoke the protections against unreasonable seizures provided by the Fourth Amendment.  *See Graham*, 490 U.S. at 394-94.  The Supreme Court has said that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  Here, the video shows that Mr. Magee was prevented from moving toward his son, who was lying on the pavement during the incident.  Mr. Magee was prevented from moving in one direction but he was never arrested, detained, or otherwise prevented from leaving the scene.  It appears that Mr. Magee could have turned around and walked away had he so desired.  In his response in opposition to summary judgment, Mr. Magee contends that Officer Gonzales restrained his liberty by "narrowing his options."  Pls.' Br. at 31.  Mr. Magee also contends that officer Gonzales grabbed him and held him against a police squad car but is unable to cite to any evidence, including his own deposition testimony, to substantiate this claim.  Moreover, narrowing a person's options is not akin to a seizure, as defined by the Fourth Amendment.  *See Mendenhall*, 446 U.S. at 554.  Thus, Mr. Magee's claim that he was seized is tenuous.

In addition, with regard to Mr. Magee's contention that Officer Gonzales used excessive force, the videotape shows little contact between the Defendants and Mr. Magee. At one point, Mr. Magee approaches Kinnell, who at that point was lying face up on the pavement, with a jacket in hand and gives the jacket to a police officer, apparently requesting that the officer cover Kinnell's naked body. Another officer, believed to be Officer Gonzales, then physically escorts Mr. Magee away from Kinnell's body toward the back of a police car that is only feet from Kinnell. The Court is unable to characterize the physical contact as a push or a shove and finds that the contact cannot be construed to be unreasonable under the circumstances. However, the videotape only captured a portion of the incident. It is possible that the blows complained of by Mr. Magee occurred when the camera was not recording and thus the videotape evidence is not conclusive.

At deposition, Mr. Magee testified that he was hit on the top of the head with a baton. In response to the Defendants' interrogatories, Mr. Magee stated that he sought medical care at Methodist Hospital for the injuries he received from being struck by the police officer's baton. Mr. Magee further stated that he has suffered physical and mental pain as a result of the attack. The Defendants attached medical records to their brief that provide a medical history of Mr. Magee's treatment at Methodist Hospital from January 2004 on. Within this timeframe, Mr. Magee visited Methodist Hospital on the following three dates: July 4, 2004, September 3, 2004, and November 11, 2006.

On July 4, 2004, Mr. Magee reported to Methodist Hospital complaining of pain in his left arm, shoulder, and elbow, as a result of being assaulted that afternoon. On September 3, 2004, Mr. Magee complained of pain to his left hand and that the hand was limp due to the fact that he had used a jackhammer for a long time. On November 11, 2006, Mr. Magee complained of pain and

34

swelling to his right occipital scalp, which began three days earlier.  None of these reported maladies are consistent with a February 26, 2004, blow to the head.

The Defendants contend that Mr. Magee has not produced enough supporting evidence to defeat summary judgment.  The sum of the evidence supporting Mr. Magee's claim is his self-serving testimony at deposition and his son's deposition testimony.  Willie Jr. testified that he saw a police officer strike his dad with a baton.  The medical records from Methodist Hospital, which Mr. Magee testified at deposition and stated in his responses to the Defendants' interrogatories would support his claim, actually provide no support for Mr. Magee's allegation.  The videotape that Mr. Magee cites as support for his claim reveals that Officer Gonzales used de minimus force to escort Mr. Magee away from Kinnell.  Without any additional supporting evidence, the self-serving testimony of Mr. Magee and Willie Jr. is insufficient to survive summary judgment.  Thus, the Court grants the Defendants' Motion for Summary Judgment as to Mr. Magee's § 1983 claim against Officer Gonzales for excessive use of force.

### iv.  Failure to intervene

The Plaintiffs contend that Officer Gonzales violated Kinnell's constitutional rights by failing to stop Officers Suttles, Tatum, and Minkah from using excessive force.  In their brief in opposition to summary judgment, the Plaintiffs argue that "Officer Gonzales owed a more onerous duty to intervene and stop the violation of the Decedents' [sic] civil rights."  Pls.' Br. at 27. Considering a similar claim in a past case, the Seventh Circuit reasoned:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994); *accord Byrd v. Clark*, 783 F.3d 1002, 1006-07 (11th Cir. 1986)).  The Plaintiffs must show that the defendant's failure to intervene deprived the plaintiff of a constitutional right.  *See Yang*, 37 F.3d at 284.  "The number of officers present and able to intervene to save an innocent person from unconstitutional summary punishment inflicted by a fellow officer, in no way correlates with any one officer's duty to intercede.  Each police officer present has an independent duty to act." *Id*. at 286.

Here, the Court previously determined that whether the individual police officers who physically restrained and became physically involved with Kinnell violated his constitutional rights is a question of fact to be determined by a jury at trial.  Thus, the question of whether excessive force was used against Kinnell is still outstanding.  As a result, at this time the Court cannot reach a final decision on this claim, which as a threshold determination requires the Court to conclude whether Officer Gonzales could have prevented a deprivation of Kinnell's constitutional rights.  Thus, the Court denies the Defendants' Motion for Summary Judgment on the Plaintiffs' claim that Officer Gonzales failed to intervene and prevent a constitutional deprivation.

b.  "Clearly established" constitutional rights

Finding that in the light most favorable to the Plaintiffs, the facts alleged are such that a reasonable finder of fact could conclude that the Plaintiffs' claims of excessive force against Officers Suttles, Tatum, and Minkah, and failure to intervene against Officer Gonzales, allege constitutional violations, the Court now turns to analyze whether Kinnell's right to be free from the excessive use of force was "clearly established" at the time of the incident.  To be clearly established, the right at issue must be:

sufficiently clear that a reasonable official would understand that what he is doing
violates that right.  This is not to say that an official action is protected by qualified
immunity unless the very action in question has previously been held unlawful; but
it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640; *see also Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006).

The Seventh Circuit in *Sallenger v. Oakes*, considered whether the plaintiff's decedent son's
right to be free from the excessive use of force was clearly established.  *See* 473 F.3d 731, 741-42
(7th Cir. 2007).  The Court considered the totality of the facts alleged to conclude that the right was
clearly established.  The court reasoned that the plaintiff's allegations that the defendant police
officers repeatedly struck the son with their fists, struck the son with flashlights, and failed to turn
the son on his side after putting him in a potentially dangerous restraint position, led to the
conclusion that his right to be free from such force was "'sufficiently clear that a reasonable official
would understand that what he [was] doing violate[d] that right.'" *Id*. at 742 (quoting *Miller*, 444
F.3d at 934).

Viewing the facts in the light most favorable to the Plaintiffs, the facts in *Sallenger* are not
identical to the facts presented in this case, but the Court finds that a reasonable police officer would
have known that punching, striking, and choking an arrestee who was handcuffed, naked, and lying
face down in a street, while an officer sat on the man's back violated the man's Fourth Amendment
right to be free from the use of excessive force.  Officer Gonzales, who witnessed such events, too
would have reasonably known that the other officers' actions violated Kinnell's Fourth Amendment
rights, and would have then reasonably known that his failure to intercede was a violation of
Kinnell's constitutional rights.  Thus, the Court finds that Kinnell's right to be free from excessive
use of force was clearly established and if the jury concludes that the individual Defendant police

officers violated Kinnell's constitutional rights, the defense of qualified immunity will be unavailable to those Defendants.

*2.  Claims against municipal Defendants the City of Gary and the Gary Police Department*

The Plaintiffs assert two distinct claims against the municipal Defendants.  First, the Plaintiffs allege that the City of Gary and the Gary Police Department had a practice or policy of using excessive force, and second allege that the municipal Defendants failed to adequately train City of Gary police officers to use force.  The Plaintiffs are required to make a different showing to defeat summary judgment as to the municipal Defendants.  To establish a § 1983 claim against the municipal Defendants, the Plaintiffs must show that the municipal entities violated Kinnell's constitutional rights in one of three ways: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.  *See Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006).  The Plaintiffs cannot establish municipal liability under  § 1983 through a respondeat superior theory, the law demands that the municipality play a more active role in the alleged constitutional deprivation.  *See Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 405 (1997); *Riordan v. City of Joliet, et al.*, 3 F. Supp. 2d 889, 899 (N.D. Ill. 1998).  Ultimately, to prevail, the Plaintiffs must show that through deliberate conduct, the local government agency was the "moving force" behind the alleged injury.  *Brown*, 520 U.S. at 404.

Here, the Plaintiffs do not allege that the municipal Defendants have an express policy in place that, when enforced, caused a constitutional deprivation.  Instead, the Plaintiffs allege that the

City of Gary and the Gary Police Department have a widespread practice of ignoring officers' use of excessive force. The sum of the Plaintiffs' evidence corroborating their claim that such a practice exists is made up of assertions within the Plaintiffs' Amended Complaint, allegations contained within the Plaintiffs' brief in opposition to summary judgment, and the deposition testimony of the Plaintiffs themselves. The Plaintiffs do not refer to other specific instances in which the municipal Defendants ignored use of excessive force by Gary police officers or submit any evidence of such a practice or policy ignoring the use of excessive force.

For the Plaintiffs to establish a municipal policy or practice so settled as to constitute a "custom or usage" with the force of law, the Plaintiffs must "point to instances demonstrating a long-standing and widespread practice of constitutional deprivation either acquiesced to or noticed by municipal policy makers." *Alexander v. City of South Bend*, 320 F. Supp. 2d 761, 781 (N.D. Ind. 2004) (citing *Roach v. City of Evansville*, 111 F.3d 544, 549 (7th Cir. 1997)). The United States Supreme Court held that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985). The Court continued, "But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id*. at 824.

Here, the Plaintiffs assert a single incident of alleged unconstitutional activity committed by non-policymaking police officers. The Plaintiffs do not point to any other instances where officers

of the Gary Police Department deprived citizens' constitutional rights, nor do the Plaintiffs point to a policy that is itself unconstitutional.   In order to defeat summary judgment, the Plaintiffs are required to submit more than self-serving statements and conclusory allegations.  *See Perez v. Norwegian-Am. Hosp., Inc.*, 93 Fed. Appx. 910, 915 (7th Cir. 2004); *Hall v. Bodine*, 276 F.3d 345, 354 (7th Cir. 2002).  There must be supporting evidence in the record, *see id.*, and here, there is no support for a § 1983 claim against the municipal Defendants.  Thus, without evidence of other constitutional violations that were inadequately or improperly responded to by the municipal Defendants, the Court grants the Defendants' Motion for Summary Judgment as to the § 1983 claim that the City of Gary and the Gary Police Department had a practice or policy allowing for excessive use of force.

The Plaintiffs also allege that the City of Gary and the Gary Police Department failed to institute training programs for police officers regarding the use of dangerous restraint holds or use of excessive force.  The Supreme Court has stated that a municipality's failure to train its police officers gives rise to liability only when the failure to train amounts to "deliberate indifference to the constitutional rights of its inhabitants."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *see also Washington v. Village of Riverside, Ill.*, No. 01 C 7438, 2003 WL 1193347 (N.D. Ill. Mar. 13, 2003).  The plaintiffs must also demonstrate that the defendant municipality had notice that the omission of training would likely result in a constitutional violation.  *See Palmquist v. Slevik*, 111 F.3d 1332, 1344 (7th Cir. 1997); *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994).  In *Canton*, the Court reasoned that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can

40

reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. The Court held that in such an instance, the municipality may be liable for its failure to provide proper training. *See id.*

Here, the Plaintiffs' claim fails because there is no evidence that the Defendant municipalities acted with indifference toward the constitutional rights of their citizens or that the municipalities had notice that the omission of training would likely result in a constitutional violation. Nor is a need for more training plainly obvious. While the Plaintiffs' Amended Complaint alleges that the Gary Police Department was "negligent and/or reckless in failing to institute training programs and procedures for its police officer's [sic] and their supervisors regarding the use of dangerous restraint holds or use of excessive of [sic] deadly force to subdue suspects," *see* Am. Compl. at ¶ 21, the Plaintiffs provide no evidence in support of this allegation or to further explain how the Defendants' training is deficient. There is no evidence introduced through depositions, answers to interrogatories, admissions on file, or interrogatories that the Gary Police Department's training is inadequate or demonstrating that the City acted with deliberate indifference to the constitutional rights of its citizens. The only support for the Plaintiffs' claim of failure to train is found in the Plaintiffs' Amended Complaint and summary judgment briefing, which alone, cannot defeat summary judgment. As a result, the Court grants the Defendants' Motion for Summary Judgment as to the claims against the City of Gary and the Gary Police Department for failure to train.

### 3. The Defendants' failure to render appropriate care

The Plaintiffs' final allegation under § 1983 is that the Defendants acted negligently and/or recklessly with indifference toward Kinnell's medical needs by (1) failing to summon emergency

medical assistance, (2) failing to properly administer CPR or other emergency first aid, and (3) failing to transport Kinnell to the hospital, "all in violation of the Decedent's rights under 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment and the Fourth Amendment to the United States Constitution, and the Fourth Amendment to the Indiana Constitution." Am. Compl. at 23.

The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Plaintiffs, as the Court interprets their Amendment Complaint, allege that the Defendants deprived Kinnell of his liberty interest by placing him in custody and then failed to render appropriate medical care when he was unable to care for himself. The Due Process Clause of the Fourteenth Amendment is intended "to protect the people from the State." *DeShaney v. Winnebago County Dept. of Social Serv.*, 489 U.S. 189, 196 (1989). The Due Process Clause generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interest of which the government itself may not deprive the individual." *Id.* However, the Supreme Court has identified two exceptions to the general rule, where a "special relationship" may be created, thereby imposing an affirmative duty to care for an individual. *See id.* at 199-202; *Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997). The two areas are: "(1) custodial settings in which the state has limited the individual's ability to care for himself, and (2) when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced." *Stevens*, 105 F.3d at 1174 (citing *DeShaney*, 489 U.S. at 199-202).

In *DeShaney*, the Court referred to incarceration and institutionalization as examples giving rise to the "in custody" special relationship. *See* 489 U.S. at 199-200. The Court explained, "when

the State by the affirmative exercise of its power so restrains an individual's liberty that it renders

him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g.,

food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on

state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.  To determine

whether a person was in custody for Fourth Amendment purposes, "a court examines the objective

circumstances of the situation using the perspective of a reasonable person in the suspect's position."

*Stevens*, 105 F.3d at 1175.  Expanding on the "in custody" exception, the Seventh Circuit reasoned,

"when a state actor deprives a person of his ability to care for himself by incarcerating him,

detaining him, or involuntarily committing him, it assumes an obligation to provide some minimum

level of well-being and safety." *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998).

In *Allen v. City of Rockford*, the plaintiff sued defendant police officers and a municipality

under § 1983 for violating her Due Process Clause rights when police officers allowed a physician

and hospital staff to take blood and urine samples against the plaintiff's will.  *See* 349 F.3d 1015,

1016-18 (7th Cir. 2003).  Earlier, a police officer received a report of a car matching the description

of the plaintiff's driving on the wrong side of the road.  The officer proceeded to pull the plaintiff

over and place her under arrest for driving under the influence of drugs.  The police officer then

transported the plaintiff to a hospital for the complained of laboratory tests.  The defendant police

officer argued that no special relationship had been established because the plaintiff was neither

incarcerated nor institutionalized when she received the forced treatment.  The Court found that it

had made clear, since the *DeShaney* decision, that the exception to the general rule of no affirmative

duty applied to pretrial detainees.  *See id.* at 1019-20.  Thus, the Court disagreed with the

defendants, finding that the plaintiff was entitled to a certain level of care and safety.  *See id.*

Conversely, in *Phillips*, the Court delineated claims filed under the Fourth Amendment as compared to those filed under the Due Process Clause. *See* 123 F.3d at 596. In *Phillips*, police officers handcuffed a man only minutes before his death (the man was subsequently uncuffed and revived, but died the next day). Plaintiffs, family members of the deceased, brought suit, citing *DeShaney*, and alleging that the police officers violated the man's Due Process Clause rights. The court, relying on the Supreme Court's decision in *Graham*, held that the Due Process Clause was inapplicable because the complained of events took place during the man's seizure. *See id.* The court found:

> "Therefore, although '[i]t is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause . . . , that point was not crossed in this case, and the Fourth Amendment's reasonableness standard remains the sole standard by which to measure the officers' actions."

*Id.* (citations omitted) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

Here, the Defendant police officers handcuffed Kinnell minutes before his death. Thus, Kinnell was in a position substantially similar to the plaintiff in *Phillips*, in that both were physically restrained but had not been formally charged with a crime or moved from the scene. In contrast, the plaintiff in *Allen*, by the time of her alleged constitutional deprivation, was under arrest for an extended time, had been formally arrested for a specific crime, and had been transported under arrest to another location for blood and urine testing. The Court finds that the circumstances in the instant case are analogous to *Phillips* and that Kinnell was not "detained" as contemplated by Due Process Clause jurisprudence. Thus, this case does not qualify under the first exception to the general position that a municipality does not owe an affirmative duty.

44

Nor do the facts in this case meet the second exception to the general rule against an affirmative duty of the police to render medical care.  In order to meet the "state created danger" exception, the state must "place[] an individual in a position of danger that [he] would not otherwise have faced."  *Allen*, 349 F.3d at 1019 (citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).  Evaluating the exception, the Court in *DeShaney* held, "While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S.  at 201.  Cases in which the Seventh Circuit has found that a case qualifies under the state created danger exception are "rare and often egregious."  *Allen*, 349 F.3d at 1022.  For example, in *Monfils*, the court upheld a jury verdict against a police officer who allowed a voice recording of a telephone call placed by an informant to be released to the subject of the informant's tip, despite knowing that releasing the tape would place the informant in danger.  *See* 165 F.3d at 522.  Releasing the tape immediately led to the informant's death and the court found that the police officer had placed the informant in danger.  *See id*.

Here, the actions of the Defendants to not rise to such an egregious level.  When the Defendants came upon Kinnell, he was outside, naked, unresponsive, and foaming at the mouth.  Kinnell was already in a precarious position that February morning.  As the videotape reveals, the Defendants restrained Kinnell using force and attempted to administer aid once they discovered that he had stopped breathing.  Thus, the Court finds that the actions of the Defendants did not rise to a level that qualifies under the state created danger exception.  Because Kinnell is unable to successfully assert either exception, his claim for failure to render appropriate care under the Due Process Clause fails and the Defendants are granted summary judgment on this claim.

### 4. Punitive damages under § 1983

The Plaintiffs' Amended Complaint seeks punitive damages pursuant to 42 U.S.C. § 1983, alleging that the Defendants' conduct was extreme and outrageous and involved reckless or callous indifference to the Plaintiffs' federally-protected rights.   While the Defendants' Motion for Summary Judgment and accompanying briefs in support argue as to the Plaintiffs' substantive claims, they do not address the claim for punitive damages.   The Court, noting that the Plaintiffs' pleadings satisfy the facial requirements to sustain a claim for punitive damages under 42 U.S.C. § 1983, *see Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001), declines the opportunity to undertake an analysis of the punitive damages issue at this time without the assistance of briefing by the parties.   Thus, the Plaintiffs' claim for punitive damages is not defeated at the summary judgment stage.

### 5. Section 1983 conclusion

Based on the foregoing analysis, the following claims asserted under 42 U.S.C. § 1983 survive the Defendants' Motion for Summary Judgment: (1) the Plaintiffs' claim against Officers Suttles, Tatum, and Minkah, alleging that the officers used excessive force against Kinnell; (2) the Plaintiffs' claim against Officer Gonzales for failing to prevent excessive use of force; and (3) the issue of 42 U.S.C. § 1983 punitive damages.   The Defendants are awarded summary judgment against the Plaintiffs with respect to the remaining claims asserted under § 1983.

### B.  Claims under the Indiana Constitution

The Plaintiffs also seek damages against the police officer Defendants under the Indiana Constitution for violations of rights protected by the U.S. Constitution's Fourth Amendment.[7] However, the Supreme Court of Indiana "has never taken the step under the Indiana Constitution that the Supreme Court of the United States took . . . [to] recognize[] an implied right under the United States Constitution to sue individual federal agents for damages for violations of the federal constitutional rights." *O'Brien v. Town of Sellersburg*, No. 3:02CV00238, 2004 WL 1234215, at *21 (S.D. Ind. May 20, 2004) (citations omitted); *see also Fidler*, 428 F. Supp. 2d at 865.  In *Fidler*, the court declined to discuss the merits of the plaintiff's claim against defendant police officers for unreasonable seizure of his person under the Indiana Constitution, finding that no such right has been recognized by Indiana courts. *See* 428 F. Supp. 2d at 865.  Thus, the police officer Defendants in this case are entitled summary judgment as to the Plaintiffs' claims seeking damages under the Indiana Constitution.

### C.  State law claim for intentional infliction of emotional distress

The Plaintiffs allege that at some point during the incident, the Defendant police officers became aware that Ms. Shannon was videotaping their actions and that upon noticing her presence, one of the police officers walked onto her property and beat on her front door.  The police officer allegedly demanded that Ms. Shannon produce the videotape or be arrested.  Ms. Shannon refused to produce the videotape and advised the police officer to leave the premises.  Ms. Shannon alleges

---

[7]The Court notes that protection from excessive force is addressed in Article 1, § 11 of the Indiana Constitution. As to the municipality Defendants, the Court previously found that the Plaintiffs failed to support a cognizable claim of any constitutional violation.

that the police officer's actions were extreme and outrageous and that the police officer intentionally and/or recklessly caused her to suffer severe emotional and mental distress.

The Defendants first assert an affirmative defense of immunity to the state law tort action alleged by the Plaintiffs.  The Defendants rely on the Indiana Tort Claims Act § 34-13-3-5(b), which provides, "A lawsuit alleging that a[] [governmental] employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b).  The Indiana Court of Appeals recently interpreted a decision of the Supreme Court of Indiana to state that Indiana Code § 34-13-3-5(b) stands for the proposition "that a plaintiff cannot sue a governmental employee personally if the complaint, on its face, alleges that the employee's acts leading to the claim occurred within the scope of his employment."  *City of Gary v. Conat*, 810 N.E.2d 1112, 1118 (Ind. Ct. App. 2004) (citing *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003)).  In order to state a cause of action against a government employee personally, a plaintiff must allege that an act or omission of the employee is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally.  *See* Ind. Code § 34-13-3-5(c).

Here, the Plaintiffs sued the individual police officer Defendants in their personal as well as official capacities.  The text of the Plaintiffs' amended Complaint alleges that the Officers "acted in their official capacities" during the incident.  Am. Compl. at ¶ 2.  The Plaintiffs do not make any specific allegations that the Defendant police officers acted outside the scope of their employment during the actions which give rise to the Amended Complaint.  The Plaintiffs also do not allege that the Defendants committed any criminal, malicious, willful and wanton, or personally beneficial act.  Thus, the Court finds that pursuant to Indiana Code §§ 34-13-3-5(b) and (c), the police officer

Defendants are immune in their personal capacities from the Plaintiffs' allegation of intentional infliction of emotional distress.

The Defendants also contend that the Plaintiffs' claim of intentional infliction of emotional distress fails on its merits.  In Indiana, the tort of intentional infliction of emotion distress occurs when "'one who by extreme and outrageous conduct intentionally or reckless causes severe emotional distress to another.'"  *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (quoting Restatement (Second) of Torts § 46 (1965)).  It is the intent to harm one emotionally that constitutes the basis for the tort.  *See Cullison*, 570 N.E.2d at 31.  The Plaintiffs' pleading tracks the case law definition of the tort of intentional infliction of emotional distress almost identically.  However, the Plaintiffs must go beyond the language of their pleading and produce supportive evidence in order to survive summary judgment.  *See Donovan*, 17 F.3d at 947.  The Defendants argue that they have not done so.

Examining the record, the Court finds that Ms. Shannon's only personal participation in this lawsuit was to answer written discovery (interrogatories) submitted by the Defendants.  While this minimal involvement by Ms. Shannon may not be the death knell for her tort claim, it is indicative of the lack of participation and lack of evidence that she has produced to support her claim.  Ms. Shannon has produced nary a medical or pharmaceutical record documenting her alleged emotional distress, nor has she appeared for a deposition to explain the effects of the alleged extreme and outrageous conduct.

Relevant case law explains the level of outrageous conduct and intent that a plaintiff must substantiate in order to survive summary judgment.  In *Beauchamp v. City of Noblesville, Indiana*, the court ruled in favor of a defendant police officer at summary judgment where the plaintiff

49

alleged that the police officer called her an offensive term while searching her home in an outrageous fashion. *See* 320 F.3d 733, 747 (7th Cir. 2003). The court found that the conduct did not rise to the level of extreme and outrageous conduct necessary to sustain a tort claim. *See id*. In *Cullison*, the court ruled against a plaintiff at summary judgment who alleged that five defendants broke into his home, one of them wearing a pistol, and threatened him, knowing that he "disliked" guns. 570 N.E.2d at 28-31. The court held that the plaintiff's allegation that the defendants knew he disliked guns could not be stretched into an inference that the defendants intended to inflict emotional injury. *See id*. at 31.

Courts outside this circuit have arrived at differing conclusions when considering whether threats by a police officer amount to extreme and outrageous conduct. *Compare Rogala v. Dist. of Columbia*, 161 F.3d 44, 57-58 (D.C. Cir. 1998) (court found that defendant police officer's conduct was not egregious to the extent that satisfied the required level of extreme and outrageous behavior where officer threatened the previously arrested plaintiff, yelled at her, laughed at her, and detained her for an unnecessary lengthy of time in the police station); *with Fisher v. Padilla*, No. CV064009213S, 2006 WL 2053511, at *3 (Conn. Super. Ct. June 30, 2006) (denying defendant's motion to strike intentional infliction of emotional distress claim when plaintiffs alleged that defendant wrote a letter threatening to have them arrested and then arranged for a police officer to call threatening the same, despite the fact that plaintiffs had not committed a crime).

Here, the Plaintiffs allege that the Defendant police officer, who remains unidentified, banged on Ms. Shannon's door and demanded that she turn over the videotape of the incident. The Plaintiffs also allege that the police officer threatened to arrest Ms. Shannon if she refused. However, the Plaintiffs do not allege that the Defendant police officer ever came into Ms. Shannon's

home, physically made contact with her, took or received the videotape, or did anything to follow up on his threat. According to the Plaintiffs' allegations, Ms. Shannon's contact with the Defendant police officer was brief. Ms. Shannon contends that the brief contact led to severe emotional distress, including medical and pharmaceutical bills, but has submitted no evidence to support those claims. While a threat of arrest delivered by a police officer may be extreme or outrageous conduct depending on the context in which it is delivered, Ms. Shannon has presented no evidence, aside from her bare allegations, that she suffered any emotional distress. As a result, her claim fails and the Court grants the Defendants' Motion for Summary Judgment as to Ms. Shannon's claim of intentional infliction of emotional distress against one unidentified police officer.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment [DE 38], the Plaintiff's Motion in Opposition to Summary Judgment [DE 53], and the Motion to Strike [DE 57]. The Court **GRANTS** the Defendants' Motion for Summary Judgment with respect to the Plaintiffs' claims that (1) Police Chief Watson violated the Plaintiffs' constitutional rights; (2) that Officer Gonzales violated Mr. Magee's constitutional rights; (3) that the City of Gary and the Gary Police Department violated the Plaintiffs' constitutional rights; (4) that the Defendants failed to render appropriate medical care to Kinnell; and (5) that one unidentified police officer intentionally inflicted emotional distress on Ms. Shannon. The Plaintiffs' remaining claims are still pending in this matter.

SO ORDERED this 20th day of November, 2007.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATE DISTRICT COURT

cc:    All counsel of record.